IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| KATHY LYNN CAMPBELL, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN )<br>Acting Commissioner, )<br>Social Security Administration )<br>Defendant. ) | Civil Action No. 5:15-cv-00048<br><br>**MEMORANDUM OPINION**<br><br>By: Joel C. Hoppe<br>United States Magistrate Judge |

Plaintiff Kathy Lynn Campbell asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence and that the case must be remanded for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

2

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

II. Procedural History

Campbell applied for DIB and SSI in February 2011, alleging disability caused by fibromyalgia and hypermobile joints, with pain in her back, legs, arms, thighs, and left foot. Administrative Record ("R.") 101, 111, ECF No. 10. She initially claimed that her disability began on December 31, 2007, R. 102, 112, but she later amended her alleged onset date to August 28, 2010, R. 35–36, at which time she was twenty-nine years old, R. 23. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial and reconsideration stages. R. 101–20, 123–42. Following an administrative hearing, R. 31–62, ALJ Drew Swank denied Campbell's claim in a written decision issued on June 29, 2012. R. 148–57. The Appeals Council found that ALJ Swank's decision contained multiple errors, however, and remanded Campbell's claim for a new hearing. R. 163–65.

On March 14, 2014, Campbell appeared with counsel at a hearing before ALJ Brian Rippel. R. 63–100. ALJ Rippel issued a written decision denying Campbell's claim on March 25, 2014. R. 12–24. He found that Campbell had severe impairments of fibromyalgia and degenerative disc disease, but also found that her medically determinable mental impairment of depression was non-severe. R. 14–16. He next determined that none of Campbell's impairments, alone or in combination, met or medically equaled a listed impairment. As to Campbell's residual functional capacity ("RFC"),[1] the ALJ found that she could perform sedentary work[2]

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

3

with occasional balancing, stooping, and climbing ramps and stairs; never crouching, crawling, or climbing ladders, ropes, or scaffolds; and an option to alternate between sitting and standing. R. 16–23. Based on this RFC finding and the testimony of a vocational expert ("VE"), the ALJ determined that Campbell could not perform her past relevant work as a car detailer, but could perform other work existing in the national and regional economies; therefore, he concluded that she was not disabled. R. 23–24. The Appeals Council denied Campbell's request for review, R. 1–3, and this appeal followed.

### III. Discussion

On appeal, Campbell argues that the ALJ erred in analyzing and weighing the medical opinion evidence. Pl. Br. 4–7, ECF No. 14. Because the ALJ's analysis of the opinions is not supported by substantial evidence, this case must be remanded.

*A.     Medical Opinions*

*1.     Dr. Elsea*

Richard Elsea, M.D., Campbell's primary care physician, treated Campbell for a variety of ailments beginning in July 2009. R. 498. Campbell first complained to Dr. Elsea about chronic pain symptoms in September 2009, informing him that she had pain in her neck and down through her mid-thoracic area that made it difficult for her to move her head. R. 498. Beginning in February 2010, Campbell complained to Dr. Elsea of intense pain in her lower back, abdomen, and legs. R. 481, 483, 486–87, 498. Although Dr. Elsea initially thought that Campbell's pain might be related to a problem with a disc, R. 498, imaging of Campbell's lower back showed

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

4

only mild scoliosis and degenerative changes, with no obvious nerve impingement, spondylolisthesis, or spondylosis, R. 484, 528, 538. Dr. Elsea also considered that Campbell's pain could have been caused by pressure from a palpable mass located in the sacral area. R. 481, 483, 486–87. Campbell underwent surgery to remove the mass in April 2010, R. 532, 534, but this did not provide long-term relief, and Campbell's symptoms returned by August 2010, R. 478–79, 481.

Over the course of his treatment relationship with Campbell, Dr. Elsea observed that she exhibited a significant amount of tenderness to palpation in her back, pelvis, buttocks, and hips. R. 479, 481, 486.[3] Dr. Elsea also noted that Campbell had hypermobile joints and opined that this may have been the result of Ehlers-Danlos syndrome, a congenital condition, which could have contributed to Campbell's pain. R. 479, 481, 483, 486–87, 502. Findings on physical examination were otherwise unremarkable, with normal range of motion and gait, full strength and reflexes in the extremities, and negative straight leg raise testing. R. 479, 483, 486; *see also* R. 463, 510–11, 513, 515, 531, 538 (noting similar findings by other physicians). At a visit in October 2011, Dr. Elsea acknowledged that Campbell "clearly meets all criteria with respect to severe fibromyalgia, which markedly limits her," and he also continued to suspect some type of neuropathic pain adjacent to the sacroiliac joint. R. 592. He noted that she had difficulty lying down, sitting, or walking for long periods of time and that her pain medication provided no relief. *Id.*

Dr. Elsea completed a physical RFC questionnaire on October 23, 2011. R. 588–91. He noted that Campbell suffered from fibromyalgia and hypermobile joints and that her prognosis was poor. R. 588. Dr. Elsea stated that Campbell had diffuse, severe pain, was extremely

---

[3] Other doctors, whom Campbell saw on referral from Dr. Elsea, also observed tenderness of the legs and some numbness and diminished sensation in the extremities. R. 505, 512–13, 515–16, 529–31, 538.

5

fatigued, and had difficulty walking for more than a block without assistance. *Id.* He stated that Campbell was not a malingerer and that emotional factors did not contribute to her symptoms, although he noted that she suffered from depression and anxiety. R. 588–89.

With regard to Campbell's limitations, he opined that her symptoms would constantly interfere with her attention and concentration and that she would be incapable of even low stress jobs. R. 589. He stated that Campbell could walk less than one block without severe pain, could sit or stand for only five minutes at one time, could not sit for more than two hours total in an eight hour day, could not stand or walk for more than two hours in an eight hour day, and would need to walk around at frequent intervals throughout the day. R. 589–90. He noted that Campbell could only occasionally move her head around and could rarely lift or carry less than ten pounds, but also stated that she could frequently lift or carry between ten and fifty pounds. R. 590. Dr. Elsea found that Campbell could occasionally twist; could rarely stoop, crouch, or climb stairs; and could never climb ladders. R. 591. In addition, he noted that Campbell had good and bad days, but stated that even her "good" days were still bad. *Id.* As a result of the limitations caused by her fibromyalgia, Dr. Elsea stated that Campbell would be unable to work. R. 588, 591.

2. *Dr. Hogenmiller*

Beginning in Feburary 2011, Campbell treated with Matthew S. Hogenmiller, M.D., a rheumatologist. R. 544–47. At their initial consultation, Campbell informed Dr. Hogenmiller that she had experienced pain and muscle weakness in her legs and thighs since the previous July,[4] and at the time of her visit she rated her pain at 4.5/5 in intensity. R. 544. Campbell reported that she got between six and eight hours of sleep every night, but that she felt rested in the morning only about half the time and that she felt stiff for about thirty minutes in the morning. *Id.* She

---

[4] Dr. Hogenmiller expressed skepticism that Campbell's pain had begun that recently. R. 546.

6

described some improvement with her nighttime symptoms since she began taking Neurontin, although she also stated that her sleep had not improved and that she continued to experience steady pain throughout the day. *Id.* She complained of worse pain in her lower extremities than in her upper extremities, and she noted that the pain flared up with activity. *Id.* She also stated that she felt stiff after extended periods of sitting. *Id.* Campbell informed Dr. Hogenmiller that, aside from Neurontin, none of her medications provided any benefit. *Id.*

On examination, she exhibited substantial hypermobility and greater than eleven out of eighteen tender points. R. 545. Dr. Hogenmiller noted that Campbell was younger than most patients who develop fibromyalgia, but he stated that the onset of joint pains and muscle aches at a younger age was typical for someone with severe hypermobility. R. 546. He recommended that Campbell begin a very light regimen of physical therapy, but he cautioned that this would not necessarily be helpful and observed that the lengthy period of travel to the nearest physical therapy facility may cause additional pain that would outweigh the benefits of therapy. *Id.*[5] He also recommended that Campbell increase her dosage of pain medication. *Id.*

Campbell periodically returned to Dr. Hogenmiller for further evaluation, medication adjustment, and occasional injections for her hips and right shoulder, which provided no long-term relief. R. 552, 554, 556–57, 559, 577–79, 705–18. On examination, Dr. Hogenmiller continued to observe multiple tender points, including the lumbar back[6] and hips. R. 556–57, 708, 712, 714–15, 717–18. In April 2013, Dr. Hogenmiller informed Campbell's new primary care physician, Diane Landauer, M.D., that Campbell's pain, particularly in her left lower

---

[5] Campbell consulted with a physical therapist on one occasion, but she chose to proceed with a muscle biopsy rather than continue therapy at that time. R. 466. There is no indication in the record that Campbell ever pursued physical therapy after this.

[6] Imaging of Campbell's lumbar spine, taken in May 2013, showed that her degenerative disc disease had progressed. R. 697.

extremity, had been getting worse and that she had never had anything better than a modest response to her medications. R. 682.

On April 24, 2012, Dr. Hogenmiller completed an RFC questionnaire concerning Campbell's fibromyalgia. R. 581–86. He stated that Campbell met the American College of Rheumatology criteria for fibromyalgia, had also been diagnosed with depression, and had a poor prognosis. R. 581. As to her specific symptoms, Dr. Hogenmiller indicated that Campbell had multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, frequent and severe headaches, numbness and tingling, sicca symptoms, anxiety, and depression. *Id.* He stated that Campbell was not a malingerer, but he also indicated that emotional factors contributed to the severity of her symptoms. R. 582. He identified pain throughout her spine and in her chest, shoulders, arms, hands, hips, legs, knees, ankles, and feet. *Id.* He noted that the pain was constant and not relieved much with rest, and he stated that the pain was brought on by changing weather, fatigue, movement and overuse, cold, stress, and static position. *Id.*

Dr. Hogenmiller indicated that Campbell's pain would constantly be severe enough to interfere with her attention and concentration, that she was incapable of even low stress jobs, and that her medications caused drowsiness. R. 583. He stated that she could walk for one block, sit for ten to twenty minutes at a time, and stand for five minutes at a time. *Id.* He found that Campbell could sit for two hours and stand or walk for two hours in an eight-hour day, and he noted that she would need to shift positions at will and walk around every twenty minutes. R. 583–84. He also found that Campbell would need to take unscheduled breaks throughout the day to lie down or sit quietly. R. 584. Dr. Hogenmiller opined that Campbell could rarely lift less than ten pounds and never lift ten pounds or more, and she could never twist, stoop, crouch, or

8

climb ladders or stairs. R. 584–85. He stated that she could rarely move her head and would have significant limitations in doing repetitive reaching, handling, and fingering. R. 585. Finally, he noted that Campbell's impairments were likely to produce good and bad days and that she would likely be absent from work more than four days per month. *Id.* Dr. Hogenmiller reaffirmed in January 2014 that Campbell's condition had remained unchanged since he issued his opinion in April 2012. R. 735.

      3.     *Dr. Kohler*

Campbell visited consulting examiner Scott Kohler, M.D., on August 28, 2013, for an evaluation of her impairments. R. 607–12. She reported that she had suffered from fibromyalgia since 2011. She described pain in her back, left foot, thigh, hip, and bilateral arms, along with swelling of her legs, hypermobile joints, numbness, dizziness, fatigue, and nausea. R. 607. She stated that her pain was exacerbated by physical activity, and she reported that it normally rated 4/10 in intensity, but was 7/10 at the time of the examination. *Id.* Campbell explained that she slept six to seven hours per night sporadically and that she did not feel well rested in the morning. *Id.* She informed Dr. Kohler that a typical day "consist[ed] of doing things around the house," and she described functional limitations of sitting thirty minutes, standing ten to fifteen minutes, walking about fifty feet, and lifting and carrying five pounds frequently and ten to fifteen pounds occasionally. R. 608.

On examination, Dr. Kohler found that Campbell was oriented to time, place, person, and situation and she had appropriate mood, clear thought processes, normal memory, and good concentration. R. 609. She had a symmetric and steady gait, did not use an assistive device, and had good coordination. R. 609–10. Campbell had full muscle strength and normal sensation and reflexes throughout, and her straight leg raise test was negative bilaterally. R. 610. She had no

9

joint swelling, erythema, effusion, or deformity. *Id.* Campbell was tender to palpation over the bilateral shoulder joints and diffusely tender to palpation of all muscles, worse proximally in the arms and legs. *Id.* She was able to lift, carry, and handle light objects; squat and rise from a squatting position with ease; rise from a sitting position without assistance; and get up and down from the examination table without difficulty. *Id.* She could walk on heels and toes, tandem walk, and hop on both feet. *Id.* Her range of motion was fully normal throughout. R. 611. As to Campbell's functioning, Dr. Kohler opined that she could sit, stand, and walk normally in an eight-hour workday with normal breaks. R. 612. He found that she could walk over short or long distances and over uneven terrain without an assistive device. *Id.* He stated that she could lift and carry forty to fifty pounds frequently and seventy-five pounds occasionally and that she would have no postural, manipulative, or environmental limitations. *Id.*

Dr. Kohler submitted another RFC assessment on September 25, 2013, that in some ways contradicted his earlier opinion. R. 614–19. He found that Campbell was able to lift or carry up to ten pounds frequently and up to fifty pounds occasionally, but could never lift more than fifty pounds. R. 614. He determined that she could sit for ninety minutes, stand for thirty minutes, or walk for ten minutes at a time without interruption, and that she could sit five hours, stand two hours, and walk one hour in total over an eight-hour day. R. 615. He found that Campbell could continuously reach, handle, finger, and feel with both hands, could frequently push and pull with both hands, and could continuously operate foot controls. R. 616. As to Campbell's postural limitations, Dr. Kohler opined that her pain would limit her to frequent stooping, kneeling, and crouching and occasional balancing, crawling, and climbing of stairs, ramps, ladders, and scaffolds. R. 617. He found that Campbell could tolerate continuous exposure to humidity, respiratory irritants, extremes in temperature, and noise, but that she should be limited to

10

frequent exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, and vibrations. R. 618. Finally, he found that Campbell could perform routine activities, including shopping, traveling by herself, ambulating without assistance, walking a block at a reasonable pace, using public transportation, climbing a few steps at a reasonable pace, preparing a simple meal and feeding herself, caring for her personal hygiene, and sorting, handling, and using paper files. R. 619.

### 4. DDS Examiners

On April 19, 2011, as part of the initial review of Campbell's claim, DDS expert William Amos, M.D., assessed Campbell's physical functioning. He found that she could lift or carry ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours, and sit for about six hours in an eight-hour day. Dr. Amos also found that Campbell needed to alternate periodically between sitting and standing every two hours. As to her postural limitations, which Dr. Amos attributed to her hypermobile joints and possible Ehlers-Danlos syndrome, he determined that she could occasionally climb ramps or stairs, balance, and stoop, but that she could never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. R. 106–07, 116–17. On reconsideration, DDS expert Paul Frye, M.D., reaffirmed Dr. Amos's findings in an opinion dated July 15, 2011. R. 128–29, 138–39.

## B. Analysis

An ALJ must consider and evaluate all opinions[7] from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. §§ 404.1527, 416.927. The regulations classify medical opinions by their source: those from treating sources and those from nontreating sources,

---

[7] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

11

such as examining physicians and state-agency medical consultants. *See id.* §§ 404.1527(c), 416.927(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178.

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Furthermore, in determining what weight to afford a treating source's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. *Id.* That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012). The ALJ must consider the same factors when weighing medical opinions from nontreating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

Here, the ALJ gave little weight to any of the treating source opinions[8] and gave the greatest weight to the opinions of Dr. Amos and Dr. Frye, the DDS reviewers. R. 22. Specifically as to Dr. Elsea, the ALJ gave his opinion no weight because of its internal inconsistency as to the

---

[8] In addition to the opinions of Dr. Elsea and Dr. Hogenmiller, there was also an opinion in the record issued on January 20, 2014, by Allison Chupp, NP-C, who had treated Campbell since June 2013. R. 742–45. The ALJ gave no weight to this opinion solely because Chupp, a nurse practitioner, was not an acceptable medical source under the regulations. R. 22..

12

amount of weight Campbell could lift or carry and because, as Campbell's counsel informed the ALJ at the hearing, R. 67, Dr. Elsea had lost his medical license in December 2012. From this information, the ALJ extrapolated that Dr. Elsea "was obviously found to have violated [the] medical code of ethics." R. 22. These are not adequate reasons to fully discredit the opinion of a treating physician. The fact that Dr. Elsea lost his license more than a year after he rendered his opinion does not necessarily have any bearing on the validity of his opinion at the time it was issued. The ALJ's finding that Dr. Elsea must have lost his license for some reason that necessarily casts doubt on his credibility—despite his acknowledgment that there was no evidence of the specific reason it occurred, R. 22—is entirely speculative. Without some evidence linking Dr. Elsea's license revocation, at least generally, to his treatment of Campbell and his opinion as to her functional abilities, this reason is insufficient. In addition, the ALJ's focus on an internal inconsistency regarding a single aspect of functioning as a basis to discredit the rest of Dr. Elsea's opinion lends only minimal support to his analysis. The opinion was issued in a "check-the-box" form, R. 588–91, and the inconsistency regarding Campbell's ability to lift and carry appears to be a simple clerical error, which in any case should not have affected the validity of Dr. Elsea's statements regarding the other aspects of Campbell's functioning. While this inconsistency may suggest carelessness on Dr. Elsea's part, it alone does not support dismissing his opinion in total. Furthermore, the ALJ's discussion of this opinion did not address any of the relevant factors listed in the regulations, including the extent of Dr. Elsea's treating relationship with Campbell. Thus, the ALJ's analysis was deficient, and his decision to give no weight to Dr. Elsea's opinion was not supported by substantial evidence.

At oral argument, the parties discussed whether this error may have been harmless because Dr. Elsea's opinion was more or less cumulative of Dr. Hogenmiller's opinion, which

the ALJ discussed in somewhat greater detail. Specifically, the ALJ chose to give little weight to Dr. Hogenmiller's opinion because the limitations he described were "completely inconsistent with his limited objective findings on examination, his limited treatment records and the claimant's noncompliance with his recommended treatment, i.e. physical therapy and a gentle exercise program. His reported opinion appears to adopt the claimant's allegations without balance or objectivity." R. 22. These are not entirely valid reasons, however, for discrediting Dr. Hogenmiller's findings of limitations based on Campbell's fibromyalgia pain. A lack of substantiating objective medical evidence says little about the severity of a claimant's fibromyalgia symptoms. Fibromyalgia is, by definition, a diagnosis of exclusion, *see* SSR 12-2P, 2012 WL 3104869, at *2–3 (July 25, 2012), and is typically not accompanied by objective findings, *see Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[Fibromyalgia]'s symptoms are entirely subjective."); *Tucker v. Astrue*, No. 5:11cv137, 2013 WL 1211583, at *4 (W.D. Va. Mar. 1, 2013) ("[N]ormal physical examination findings, which the Law Judge did not specifically consider in her report, are not unusual or highly relevant to diagnosing fibromyalgia or its severity, as fibromyalgia patients typically manifest normal strength, neurological reactions, and range of motion." (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 819–20 (6th Cir. 1988))), *report and recommendation adopted*, 2013 WL 1196672 (W.D. Va. Mar. 25, 2013). Thus, the overall absence of substantial objective findings in Dr. Hogenmiller's treatment notes does not necessarily undermine his opinion that Campbell would be significantly limited by her fibromyalgia pain. Moreover, Dr. Hogenmiller did note findings such as trigger points, which would support a diagnosis of fibromyalgia.

Likewise, Campbell's relatively conservative course of treatment does not necessarily cast doubt on Dr. Hogenmiller's opinion because the treatment options available for

fibromyalgia are generally conservative in nature. *See* Mayo Clinic, *Fibromyalgia Treatments and drugs*, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/treatment/con-20019243 (last visited Sept. 29, 2016) ("In general, treatments for fibromyalgia include both medication and self-care."); American College of Rheumatology, *Fibromyalgia*, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia (last visited Sept. 29, 2016) (identifying medications and non-drug treatments as potentially appropriate for fibromyalgia). Surgery is not recommended for fibromyalgia, *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003), and can actually make the condition worse, 6 *Attorneys Medical Advisor* § 44.59 (2014) (citing Aaron *et al.*, *Perceived Physical and Emotional Trauma as Precipitating Events in Fibromyalgia*, 40 Arthritis & Rheumatism 453 (No. 3 (Mar.) 1997)). The ALJ also noted that Campbell was not compliant with Dr. Hogenmiller's suggestions of physical therapy and a home exercise program. This reason provides some support for the ALJ's conclusion as no evidence in the record suggests that Campbell engaged in even the limited exercises that Dr. Hogenmiller recommended, save one visit to physical therapy. But the negative inference drawn from Campbell's noncompliance is largely negated by Dr. Hogenmiller's expressed doubt that these exercises would be very helpful and his statement that Campbell would receive no benefit from therapy if she had to drive a long distance to get to a therapy facility. R. 546. Another deficiency in the ALJ's analysis is that he appeared to give no consideration to Dr. Hogenmiller's lengthy treatment relationship with Campbell or his specialized expertise as a rheumatologist. Although these errors themselves may not be fatal, they are significant enough that I cannot consider the more glaring errors in the analysis of Dr. Elsea's opinion to be harmless.

Finally, the ALJ's reasoning for giving the greatest weight to the opinions of the DDS experts was inadequate. In his discussion, the ALJ provided little more than a vague, boilerplate statement that these opinions were "balanced, objective, and consistent with the evidence of record as a whole," and that they "clearly reflect a thorough review of the record and are supportable." R. 22. The ALJ also claimed that the DDS opinions were "generally supported by the report of the consultative examiner"—presumably a reference to Dr. Kohler's opinions,[9] although the ALJ cited to a different portion of the record. *Id.* The ALJ's assessment here appears to be erroneous, however, as Dr. Kohler's opinions, which themselves were internally inconsistent, generally set out fewer limitations than those identified by the DDS reviewers.

These flaws in the ALJ's analysis of the opinion evidence create particular difficulty in evaluating a fibromyalgia case such as this. Although fibromyalgia is typically not a disabling condition, *see Sarchet*, 78 F.3d at 307, the absence of objective signs to verify the severity of symptoms makes it all the more critical for ALJs to properly consider the opinions of medical experts. Because the ALJ failed to do so here, I find that his evaluation of the medical opinions is not supported by substantial evidence. In the absence of a proper analysis of the medical opinions and their discussion of Campbell's functional capabilities, the ALJ's RFC analysis is deficient. Although the ALJ recited the medical evidence and discussed Campbell's credibility, his written opinion does not provide an explanation, supported by substantial evidence, for his RFC determination. *See Mascio v. Colvin*, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that an ALJ needs to provide a meaningful explanation of his reasoning in reaching a particular RFC, particularly where there is contradictory evidence in the record).

---

[9] The ALJ did not assign any specific weight to Dr. Kohler's opinions.

16

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, the Court will **GRANT** Campbell's motion for summary judgment, ECF No. 13, **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REMAND** this case for further administrative proceedings, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: September 30, 2016

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge